[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14013

_____

D.C. Docket No. 2:11-cv-03497-RDP

JANET L. SKOTNICKI,

Plaintiff-Appellant,

versus

BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA, THE,
DR. ROBERT BOURGE,
SUSAN CONRAD,
ALESIA M. JONES,
GARY E. JONES,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(December 10, 2015)

Before ED CARNES, Chief Judge, TJOFLAT and SENTELLE,[*] Circuit Judges.

PER CURIAM:

Janet Skotnicki, a former nurse at the University of Alabama at Birmingham (UAB) Hospital, filed a lawsuit alleging violations of federal and state law related to the denial of her request for medical leave and the termination of her employment. The district court granted summary judgment to the defendants on all of Skotnicki's claims. This is her appeal.

## I.    Background

Viewed in the light most favorable to Skotnicki, the facts are these. In November 1998, she began working in UAB's Coronary Care Unit (CCU) as a staff nurse.[1] "Staff nurse" is the term UAB typically uses for a registered nurse (RN) who gives direct bedside care to patients. Skotnicki's job in the CCU was not sedentary and required her to have certain physical abilities.

In 1998, Skotnicki was diagnosed with Autoimmune Cerebellar Ataxia, a neurological condition that can affect gait and balance. Three years later, in June 2002, she changed her employment status from full-time (36 hours/week) to part-

---

[*] Honorable David Bryan Sentelle, United States Circuit Judge for the District of Columbia Circuit, sitting by designation.

[1] The CCU was one of several "units" in the Cardiovascular Services Department, for which defendant Susan Conrad was the Director of Nursing. Conrad testified that she had approximately fifteen Nurse Managers reporting to her from the various units of that department and that they supervised approximately 300 additional nurses, the majority of which were staff nurses like Skotnicki.

time (24 hours/week).[2]  Five years after that, in September 2007, she requested and was granted a one-month period of leave under the Family Medical Leave Act (FMLA) to seek necessary medical treatment.

While on leave, Skotnicki had a conversation with her supervisor in the CCU, Pat Long, concerning her return to work.  Long told her that she could return to one of two positions, both of which were sedentary and did not have the physical demands of bedside care.  The first position was as an "admit nurse" in the CCU, a position that UAB in late 2007 was willing to create for Skotnicki. She declined the position and it was never created for, or filled by, anyone.

The second position — the one Skotnicki elected to take — was as a nurse in the Interventional Cardiology (IC) office, a temporary position.  The position was available because, at the time Skotnicki returned from leave, IC was short three nurse practitioners and had decided to cover some of the work with staff nurses (typically RNs) until the vacant positions could be filled with nurse practitioners. Skotnicki admits that she chose the IC position over the CCU position with the knowledge that it was temporary, although she thought at the time that it "could become permanent."[3]

---

[2] The record does not tell us whether the status change was related to her medical condition.

[3] In her deposition, Skotnicki stated that she "was told initially that [the IC position] was temporary — it could be temporary, but it could become permanent.  And

In March 2008, Skotnicki received an employee performance evaluation.  It included an "individual development plan" that Skotnicki herself had written.  The evaluation and the plan were signed by Long and Long's boss, Susan Conrad.  As part of the plan, Skotnicki wrote that she would "[c]ontinue to work in [IC] or CCU as [an] admit nurse."  That was the only individual development plan and the only evaluation that Skotnicki received during her time in the IC office.

In February 2009, Skotnicki suffered a fall at her home, which left her unable to walk without assistance.  To assist her, she began using a rollator — a rolling walker — for balance support.  The rollator was the first visible sign of Skotnicki's neurological condition.  Later that same month, she learned that defendant Robert Bourge, M.D., who was in charge of IC personnel matters, was still looking to fill her position with a nurse practitioner.  On February 26, she sent an email to Dr. Vijay Misra that stated in relevant part:

> I learned this week that . . . my job will end when a fourth [nurse practitioner] is hired.  Hopefully, that will change and I will be made a permanent employee, but as much as I would like for that to happen, I don't think I can't [sic] count on it.  Although I am still technically a CCU employee[4] . . .  I am unable to return to work in CCU because

then in February 2009 I was told that it was permanent."  She identified Nurse Practitioner David Lawson as the individual who told her that the job would be permanent in February 2009.  According to the defendants, either Lawson didn't say that or, if he did, it was bad information because the plan to fill Skotnicki's temporary position with a nurse practitioner never changed.  In any event, Skotnicki acknowledges that Lawson did not have the authority to make personnel decisions.

[4] There is some record support for Skotnicki's assertion — which has come up again in this lawsuit — that she was "still technically a CCU employee."  Throughout her

4

of my neurological illness. Unless I have another office-type nursing job lined up in advance, I would have to file for disability status when my job here ends. I do not want to do that if at all possible.

In the summer and fall of 2009, Skotnicki applied to two other sedentary jobs at UAB that are relevant to her claims in this lawsuit. The first was a "Patient Flow Coordinator" position in the then-newly-created "Patient Flow Center." Skotnicki first discussed that position with Susan Kuklinski, the person who would be responsible for the Center's hiring, in June 2009. Skotnicki forwarded Kuklinski her resume. In December 2009, however, HR Consultant Sharon Lane informed Skotnicki that the position required a bachelor's degree, which is more education than the associate's degree Skotnicki had at the time.[5] The second job she applied for — a "Patient Services Coordinator I" position — required only a

_____

two plus years in the IC office, Skotnicki continued to be listed on the CCU employee roster and was supervised by CCU's nurse manager, which at some point changed from Long to defendant Gary Jones. When asked why Skotnicki was still listed and treated as a CCU employee after her move to the IC office, Conrad testified: "I had to leave [her] in [the CCU] cost center so that she could remain an employee and get benefits, because I didn't have another position to put her into. There was not a position in the [IC] office . . . that I could have transferred her to." Skotnicki's salary was covered by IC, using funds that were available as a result of the vacant nurse practitioner position(s).

[5] Skotnicki asserts that Lane's email also told her that UAB would waive the degree requirement if a job applicant was, at the time she applied, enrolled in the necessary program or agreed to obtain the degree by a certain future date. Skotnicki offers two record citations in support of the proposition that UAB had that waiver policy, neither of which are the email from Lane. The first citation is to her own testimony about what Lane told her. The second is Sharon Conrad's testimony that UAB generally allows staff nurses to complete their bachelor's degrees or other education while they are employed. Conrad said nothing, however, about whether a staff nurse could be hired into a position that required a bachelor's degree without first obtaining the degree.

high school diploma or G.E.D.   The defendants put into evidence an affidavit from Lane stating that Skotnicki was not interviewed or selected for the position "because her salary expectations exceeded the salary that [the] department was willing to pay."[6]

On December 11, 2009, Skotnicki was told that a fourth nurse practitioner had been hired for the IC position.  Because the new hire would need orientation, however, Skotnicki was asked to continue in the job until Friday, April 2, 2010. On February 10, 2010, Skotnicki sent an email to defendant Gary Jones, who was the nurse manager in the CCU and her supervisor at the time.  She wrote:

> I have decided to apply for a medical leave of absence to begin immediately when my job in the [IC] office ends on April 2.  I plan on receiving medical treatment for my medical condition during that time and hope to be able to find another position at UAB before the leave ends so that I can return to work.

The next day, Skotnicki sent another email to Jones requesting his fax number so that she could send the FMLA paperwork for his signature.  A few hours later, Jones replied:   "I am unsure about the process for FMLA at this time since your job is ending.  I will consult HR and get back with you."  Skotnicki wrote back:

---

[6] Skotnicki asserts, for the first time in her reply brief, that "[t]he posted job listing stated a salary range of between $13 and $20/hour and on her application, [she] listed $16/hour, which was clearly within the range listed." But her single record citation in support of that assertion directs us to a letter from UAB about long-term disability benefits.  As far as we can tell, there is no evidence whatsoever that Skotnicki stated that $16/hour was her salary requirement.

After this medical leave and the treatment that my physician and I plan on me receiving over those 16 weeks, it is possible I may be able to return to CCU . . . .  Or certainly that there may be another position made available to me that I will be able to do upon the completion of my medical leave.  My current position is ending, but not necessarily my employment with UAB so I believe my leave request is due to be granted.

It is undisputed that Skotnicki's FMLA application was submitted to UAB's Leave Office on February 11, 2010, and that she requested leave to begin on April 4, 2010, which was after her last day in the IC position.  On February 18, 2010 — one week after her leave request was submitted — Skotnicki received a memorandum from Conrad that stated:

> RE:    Final Day of Employment
>
> As you are aware, you were given non-bedside nursing duties in October 2007 to accommodate your medical restrictions that limited you from resuming your bedside nursing duties.  The accommodation was made at that time, because [IC] needed additional assistance. . . .  You have been repeatedly advised that you could not continue to serve in that capacity once the department was adequately staffed with [n]urse [p]ractitioners . . . .
>
> Since you have informed us that your medical condition will not allow you to return to your staff RN role in CCU and the [nurse practitioners] are nearing the completion of their orientation, I am writing to inform you that your last day of work with UAB will be Friday, March 26, 2010 (pay date of April 2, 2010.)
>
> Additionally, you recently informed your CCU Nurse Manager, Gary Jones, of your intention to apply for FMLA to begin April 2, 2010.  Because your employment will have ended by that date, we are unable to grant you FMLA unless you secure other employment with UAB prior to that time.

7

Skotnicki contacted several higher-ranking individuals at UAB to request a reconsideration of the decision to deny her leave.  By letter dated March 22, 2010, defendant Alesia Jones, who was UAB's Chief Human Resources Officer, reiterated UAB's position that Skotnicki was "ineligible for a leave of absence" because she would "not be able to return to either of [her] previous positions," which were the bedside position in CCU or the temporary IC position that had been filled with a nurse practitioner.

Skotnicki worked her last day at UAB on March 26, 2010.[7]  She then filed this lawsuit in federal district court in September 2011, alleging violations of the FMLA, the Americans with Disabilities Act, the Rehabilitation Act, and state law. On August 8, 2014, the district court granted summary judgment to the defendants on all fifteen federal claims and declined to exercise supplemental jurisdiction over Skotnicki's state law claim, dismissing it without prejudice.

## II.    Discussion

Skotnicki appeals the district court's grant of summary judgment to the defendants on four of her federal claims:  (1) a FMLA interference claim; (2) a FMLA retaliation claim; (3) a Rehabilitation Act disparate treatment claim; and (4) a Rehabilitation Act failure-to-accommodate claim.  She contends that the

---

[7] Thereafter, Skotnicki:  (1) applied for and received long-term disability benefits; (2) continued to apply for open positions at UAB and elsewhere; and (3) obtained her bachelor's degree (in February 2012).

8

district court erred by making credibility determinations, ignoring her sworn testimony, and construing the facts against her at the summary judgment stage. We review de novo a grant of summary judgment, applying the same legal standards that governed the district court's decision. McCabe v. Sharrett, 12 F.3d 1558, 1560 (11th Cir. 1994). We may affirm on any ground supported by the record, "regardless of whether the district court relied on that ground." Id.

### A.    FMLA Claims

Among the substantive rights granted by the FMLA to eligible employees[8] is the right to "12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA creates two types of claims: "interference claims, in which an employee asserts that [her] employer denied or otherwise interfered with [her] substantive rights under the Act, see id. § 2615(a)(1), and retaliation claims, in which an employee asserts that [her] employer discriminated against [her] because [s]he engaged in activity protected by the Act, see id. § 2615(a)(1) & (2)." Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001).

---

[8] An "eligible employee" is an "an employee who has been employed (i) for at least 12 months by the employer with respect to whom leave is requested . . . ; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

9

The district court never got around to addressing Skotnicki's allegations of retaliation and interference because it granted summary judgment on the ground that the requested leave "fell outside her term of employment" and the decision to terminate her "had been announced before [she] engaged in any protected activity." In essence, the court concluded that Skotnicki could not state a claim under the FMLA because she had no right to commence leave after her last day of employment, at which point she was no longer covered by the FMLA. On appeal, Skotnicki doesn't challenge the court's (correct) conclusion that the FMLA does not create a "right" to commence leave after an employee's last day of employment. Instead, she argues that the court erroneously conflated the "termination" of the temporary IC position with the termination of her employment at UAB (and, more specifically, her allegedly "permanent" position in the CCU), when in fact those were two separate events. Which is to say that she thinks her status as a CCU employee, instead of as a temporary IC employee, is the status upon which her FMLA leave request should have been evaluated, and thus the decision to deny it was "interference" with her right to take the leave and the decision to terminate her was "retaliation" for having requested it.[9]

---

[9] It is not clear to us that Skotnicki made this argument in the court below. If she did, it was not articulated well enough for the court to pick up on it; in an otherwise thorough order, it goes unmentioned. We could reject it on that basis alone. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1326–27 (11th Cir. 2004) (declining to address the merits of a claim where the appellants "raised an entirely new theory on

The problem with that argument is two-fold: there is no evidence to support it, and there is plenty of evidence to contradict it. Skotnicki relies most heavily — indeed, almost exclusively — on the March 2008 individual development plan stating, in her handwriting, that she would "[c]ontinue to work in [IC] or CCU as [an] admit nurse." But regardless of what Skotnicki's or even UAB's "plan" was in March 2008, there is nothing in the facts or the law to suggest that such a plan imposed any constraints on the employment decisions made by UAB in late 2009 and early 2010.[10]

While UAB does not direct us to any clear-cut evidence that the end of Skotnicki's temporary IC position and the end of her UAB employment were one and the same, it is undisputed that Skotnicki: (1) voluntarily took the IC position with the knowledge it was temporary; (2) repeatedly communicated that she was not capable of returning to her bedside care position in CCU; and (3) repeatedly expressed her understanding that, when the IC position ended, she would need to find another job within the UAB system or file for disability benefits. In a

appeal — one never presented to or considered by the trial court"). Giving Skotnicki every benefit of the doubt, however, we will go ahead and address the argument.

[10] Skotnicki also points to the fact that she was at all times "listed" on the CCU employee roster, but she does not explain — and we cannot discern — how that fact is significant. There is no organizational chart that shows how the parts of UAB Hospital fit together, or any explanation of the HR-related implications of being "listed" on any given roster. Indeed, the record is devoid of anything that would indicate that Skotnicki's status as a CCU employee, instead of as an IC employee, is the status upon which her FMLA leave request should have been evaluated.

February 2009 email to Dr. Misra, for example, Skotnicki stated in no uncertain terms that she was "unable to return to work in [the] CCU" and "[u]nless [she had] another office-type nursing job lined up in advance, [she] would have to file for disability status when [her] job [in IC] end[ed]."

Skotnicki's own deposition testimony contradicts her position on appeal. When asked whether she was given "notice" of her "final day of employment" after a fourth nurse practitioner was hired for IC, she responded, "Yes.  April the 2nd."  While she would no doubt urge us to read "final day of employment" as meaning "final day in the IC office," such a reading strains credibility, especially in light of the other record evidence.  Nothing in Skotnicki's sworn testimony or anything else in the record amounts to more than "a mere scintilla of evidence" that she had not already been terminated when she requested FMLA leave to begin after her last day of employment.  See Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) ("A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.") (quotation marks omitted).

There is another reason Skotnicki's FMLA claims fail.  The right to commence FMLA leave is not absolute, and "an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed

12

regardless of any request for FMLA leave." Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1236 (11th Cir. 2010). So even if UAB made the decision to terminate Skotnicki's employment, or informed her of that decision, after she requested FMLA leave, the decision would not amount to a violation of the FMLA provided that UAB's reason was unrelated to the leave request. UAB has consistently stated, and the record consistently reflects, that it terminated Skotnicki because the temporary IC position was no longer available and Skotnicki had informed the hospital that she could not return to bedside care duties in the CCU.

In sum, the FMLA does not give a terminated employee the right to commence medical leave after her last day of employment, when she is no longer covered by the Act. Even construing the facts and all reasonable inferences in Skotnicki's favor, as we must, the record is clear that she requested leave to commence after her last day of employment. As a result, there was no right with which the defendants could have interfered and there was no "protected activity" that could serve as the basis for a retaliation claim. We will affirm the district court's grant of summary judgment to the defendants on both of Skotnicki's FMLA claims.

## B.    Rehabilitation Act Claims

The Rehabilitation Act prohibits any program or activity receiving federal funds from discriminating against otherwise qualified individuals with a disability.

See Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000); see also 29 U.S.C. § 794(d).   To establish a prima facie claim of failure to accommodate under the Rehabilitation Act, Skotnicki must show that:  (1) she was disabled; (2) she was a qualified individual; and (3) she was discriminated against by way of the defendant's failure to provide a reasonable accommodation.  Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).

UAB does not dispute that Skotnicki was disabled and that she was a qualified individual.  The question is whether UAB discriminated against her by failing to provide a reasonable accommodation.  Skotnicki bears the burden of identifying an accommodation and establishing that it was reasonable.  Id.  She points to four accommodations that she requested and that UAB failed to provide.  But none of them are reasonable.

The first accommodation Skotnicki requested was medical leave.  Although granting medical leave is one way an employer may accommodate an employee with a disability, see Jackson v. Veterans Admin., 22 F.3d 277, 279 (11th Cir. 1994), the accommodation is not required unless it is a reasonable one.  A medical leave period that commences after an employee's last day of employment is not a reasonable accommodation.

The remaining three of Skotnicki's accommodation requests were essentially requests for reassignment.  We have said that reassignment to a vacant position is a

14

reasonable accommodation.  Lucas, 257 F.3d at 1256.  Any duty to reassign does not, however, require the employer to bump another employee from a position, to create a new position, to promote the disabled employee, or to assign the disabled employee to a position for which he is not qualified.  Id. at 1256–57; Terrell v. USAir, 132 F.3d 621, 625–26 (11th Cir. 1998).

Skotnicki's first reassignment request — that she be put into the CCU as an "admit nurse" — was not reasonable because it would have required UAB to create a new position.  See Terrell, 132 F.3d at 626.  The fact that UAB had offered, two years earlier, to create an admit nurse position in CCU for Skotnicki — an offer she declined — does not change anything.  Lucas, 257 F.3d at 1257 n.3 ("Good deeds ought not be punished, and an employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so."); see also Terrell, 132 F.3d at 626 n.6 ("An employer that bends over backwards to accommodate a disabled worker . . .  must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.") (quotation marks omitted).

The second reassignment request — to the "Patient Flow Coordinator" position — was not reasonable because that position required a bachelor's degree

15

and Skotnicki did not have one when she applied for the position. [11]  See Lucas, 257 F.3d at 1259 ("The law in this area is crystal clear:  an otherwise qualified person is one who is able to meet all of the [job's] requirements in spite of his handicap.") (quotation marks omitted) (alteration in original).

The third and final accommodation request — reassignment to the open "Patient Services Coordinator I" position — presents a question that the district court did not address in its order granting summary judgment to the defendants. Sharon Lane's affidavit states that Skotnicki was not selected for the job "because her salary expectations exceeded the salary that this department was willing to pay."  Skotnicki offered no response or rebuttal to that reason in the district court or in her main brief to this Court.  Instead, she waited until her reply brief to assert that "[t]he posted job listing stated a salary range of between $13 and $20/hour and on her application, [she] listed $16/hour."  And the only record citation she offered in support of that assertion — which directed us to a letter from UAB discussing long-term disability benefits — offered no such support.  Even if we were willing to entertain a critical factual assertion raised for the first time in a reply brief, which we are not, our law is clear that "[u]nsupported assertions in a brief cannot

---

[11]There is no evidence to support Skotnicki's assertion that UAB had a policy of hiring candidates without the required degree if they agreed to complete it while in the job.  Although Sharon Conrad acknowledged that UAB generally allows staff nurses to complete bachelor's degrees or other education while employed, she was not asked and did not say whether a staff nurse could be hired into a position that required a bachelor's degree without first obtaining the degree.

16

substitute for evidence in the record." ACLU v. Barnes, 168 F.3d 423, 436 (11th Cir. 1999).

Finally, Skotnicki contends that UAB's failure to hire her to the "Patient Services Coordinator I" position was not only a failure to accommodate, but also an instance of "disparate treatment." According to Skotnicki, "the resume and application of the [non-disabled] person hired were not consistent as to the person's educational background, such that . . . the inference drawn is that UAB hired a person who falsified a claim to a [b]achelor's degree . . . and discriminated against [Skotnicki] because of her disability." But aside from a stray reference in its response brief to "another candidate . . . believed to be the best candidate," UAB has relied exclusively on Skotnicki's alleged "salary expectation" as its non-discriminatory reason for excluding her from consideration. And Skotnicki has not offered any evidence to rebut that reason. See Chapman v. AI Transp., 229 F.3d 1012, 1037 (11th Cir. 2000) ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual.") (emphasis added).

**AFFIRMED.**

17